## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

ROBERT BRUNING and SHARON |
BRUNING, a married couple; |
       |
       |     Case No. _____
       |
    Plaintiffs, |
       |
vs.        |     **COMPLAINT and JURY DEMAND**
       |
CITY OF OMAHA, NEBRASKA, |
       |
    Defendant. |

COME NOW Plaintiffs Robert Bruning and Sharon Bruning ("the Brunings"), and as and for their cause of action against the City of Omaha, Nebraska, state and allege as follows:

### VENUE, PARTIES, and JURISDICTION

1.      The Brunings are citizens of the State of Nebraska residing in Douglas County.

2.      The City of Omaha ("the City") is a political subdivision of the State of Nebraska located in the County of Douglas.

3.      The Brunings are owners of property located at 16201 Fort Street, Omaha, Nebraska.  The Brunings constitute a class of one for purposes of this suit because they have been singled out from other property owners similarly situated for reasons which do not serve the City or a public purpose.

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1343 because Plaintiffs seek relief arising from a violation of the Fourteenth Amendment's guarantee of equal protection of the laws and other protections guaranteed by the Constitution of the United States of America.

5.      Venue is proper under 28 U.S.C. § 1391(b)(2) in Nebraska because that is where the real property and buildings which are the subject of this suit are located.

1

## FACTS AND BACKGROUND

6.      The Brunings purchased the property at issue in 1979.  At the time of purchase a residence and barn existed on the property.

7.      The property was used originally for feeding cattle and hogs.  Additional buildings were built over the years and commercial seed operations were established on the site.

8.      Between 1979 and 1985 buildings were constructed for the storage of seed and fertilizer and machinery, including tractors, commercial mowers, and trucks.

9.      In 2002 a Cleary pole building was constructed to store seed, fertilizer and seeding equipment.  A corn crib and storage shed were also replaced.

10.      In 2003 a second Cleary pole building was built to store seed and fertilizer.  A Quonset building was also replaced.

11.      In 2004 two Cleary pole buildings were constructed, one to store seed and fertilizer and one to store seeding equipment.  Two 10,000 bushel grain dryers and an open-end storage building were replaced.

12.      In 2004 the seeding companies were sold and the new owner continued to use the buildings for commercial seeding and mowing operations.

13.      In June 2012 a Cleary pole building was constructed for equipment storage.

14.      Some building space was eventually rented to companies, primarily lawn care and gardening contractors, for storage of trucks and other equipment used in seeding and landscaping businesses.

15.      Prior to construction of the Cleary buildings, representatives of Cleary contacted employees of the City to inquire what was necessary to obtain building permits and to acquire any necessary permits.  In every instance, employees of the City's planning and zoning

2

departments informed the Cleary representative that the buildings being constructed on the Brunings' property were agricultural buildings and no permits were required.

16.     In spring of 2015, the Brunings were notified by representatives of the City that because the buildings required permits which were not obtained at the time the buildings were constructed, the buildings must meet all current code requirements, not the code requirements in effect at the time the buildings were built.

17.     In March of 2016, the Brunings were notified that the buildings were also purportedly in violation of zoning ordinances because the storing of equipment and supplies for gardening and/or landscaping or maintenance businesses was not allowed in a Agricultural use zone unless the business operators were also the property owners.  The buildings are being used for the same purpose that they were used when the Brunings owned and operated the seeding/mowing business and stored trucks and other equipment in the buildings.  The only change in circumstances is that the Brunings are now leasing the buildings for agricultural use rather than using them personally.

18.     The Brunings were informed by the City that in addition to bringing the buildings up to certain life-safety code requirements, that leasing the buildings for storage of agricultural-related equipment was not an agricultural use and, therefore, not a permissible use for that zoning.  The City asserts that the Brunings' use of their property is now a "light industrial" use and that the property must either be used for agriculture purposes or platted and used for single-family residences.  Significant infrastructure work would have to be performed in order to convert the property to single-family homes and the Brunings would not be able to sell the property for single-family development for an amount anywhere near the current value of the

land and would suffer a huge loss on their investment in the ongoing use and maintenance of the property.

19.     The property is now surrounded by single-family homes.  Despite the adjacent residences, under the City of Omaha's directive, the Brunings could use the property as a hog confinement yard or use the property to dry and store grain.  Either of these uses would constitute a substantial disruption to the residential neighborhood surrounding the property and a substantial reduction in the highest and best use and value of the property.

20.     The Brunings have received overwhelming support from the residents of the neighborhood who do not want the land to revert to actual agricultural uses.

21.     Despite numerous attempts to work with the City Planning and Zoning Department, the Brunings have been unable to reach an agreement regarding remedying the alleged code violations as the City Planning and Zoning Department keeps "moving the goal post" and imposing additional requirements, costs, and burden upon the Brunings.

22.     The buildings on the property continue to serve the same purpose for which they were originally built, i.e. storage of equipment and supplies, although the buildings are now rented to companies other than the farming operation that was sold.

23.     The area surrounding the site at issue has substantially changed and, although zoned for agriculture, agricultural uses as suggested by the City would not be compatible with the surrounding residential areas.

24.     The City has suggested that if the Brunings do not want to go to the expense of re-zoning and retrofitting the building to present code standards, that the location be used as a commercial nursery or dog kennel.  These suggested uses, as well as other businesses allowed on

an ag-zoned property, could be challenged as a nuisance by the neighbors whose homes have been built since the farming operation was sold.

25.     By the time the Board finally denied the Brunings' request for variances, the exceptions sought by variance were very minor.  The only variances necessary were:

- To allow maximum coverage of buildings on the property to be 20% instead of 5%

- To increase the maximum impervious surface coverage from 10% to 56%

- To reduce the required street yard landscaping from 98% to 80%

- To reduce the minimum landscaping depth from 35' to 9'

- To reduce the required number of off-street parking stalls from 55 to 31 and

- Reduce the minimum perimeter parking lot landscaping from 10' to 9' and 5'.

26.     The above variances would allow the property to remain as it is and as it has been used for decades.

27.     The City has also suggested that the Brunings demolish all the existing buildings and infrastructure and develop the site as a single-family residential subdivision.  The cost of this suggested solution is cost-prohibitive.

28.     The Brunings have already lost tenants who leased the buildings on the property.

29.     Additional tenants have indicated their desire to terminate leasing the building space on the property because of the uncertainty of the future of the buildings and the property.

30.     The estimated cost of meeting all the City's current demands is nearly $1.5 million.

31.     The property's current assessed value is only $929,900.00.

32.     There are many other properties on land zoned for agriculture which are being used for non-agricultural purposes.  The City has failed and refused to enforce the zoning laws against other similarly situated property owners and have indicated that it intends to force the Brunings to vacate the property and may seek criminal charges against them if they fail to heed the City's order to cease leasing the buildings located on the property.

33.     The purpose of the City's actions is to change the use of the property without going through the procedure of a formal taking.

34.     The Brunings attempted to exercise administrative remedies by appealing the Board's decision to the District Court for Douglas County, Nebraska.  The appeal was denied and the appeal from the Board's action is presently before the Nebraska Court of Appeals.  However, the relief sought in that action is subject to a different standard than the Constitutional and Equal Protection claims raised in this suit.

### REQUEST FOR DECLARATORY JUDGMENT AND INJUNCTION

35.     The Brunings constitute a class of one who have been subjected to unequal treatment under the law by the City's refusal to allow the on-going use of the Brunings' property while refusing to enforce the same zoning restriction on other properties within the City's jurisdiction that are zoned agricultural but used for other commercial uses.  A list of some of these properties is attached hereto as Exhibit A.  The City is and has been aware of these properties.

36.     The City violated the rights of the Brunings guaranteed under Federal and State law, including 42 U.S.C. § 1983 by interfering with the Brunings' real property rights, subjecting the Brunings to the potential of criminal liability, threatening the Brunings' with criminal

penalties, depriving the Brunings of liberty and property without due process of law, failing to

afford the Brunings equal protection and due process under the law, and subjecting the Brunings

to arbitrary standards that are contrary to the law.

37.     42 U.S.C. § 1983 is captioned "Civil action for deprivation of rights" and states,

in pertinent part:

> Every person, who under color of any statute, ordinance, regulation,
> custom or usage of any state or territory or the District of Columbia
> subjects or causes to be subjected any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation of any rights,
> privileges or immunities secured by the constitution and law shall be liable
> to the party injured in an action at law, suit in equity, or other appropriate
> proceeding for redress…

38.     In order to obtain a variance to the uses allowed under a particular zoning, the

applicant has to apply to the City of Omaha Department of Planning and Zoning.

39.     If an applicant does not agree with the decision of the Planning and Zoning

Board, the applicant can appeal to the Zoning Board of Appeals.

40.     The Zoning Board of Appeals is charged with hearing and deciding appeals from

and reviewing any order, requirement, decision or determination made by an administrative

official charged with the enforcement of any ordinance adopted pursuant to Nebraska law.

41.     The Zoning Board of Appeals is additionally charged with hearing and deciding

all matters referred to it or upon which it is required to pass under ordinance adopted pursuant to

Nebraska law.

42.     In its recommendations against granting a variance that would not deprive the

Brunings of their property, the Planning Department found there is no "demonstrated hardship or

practical difficulty as defined by law," and set forth several alleged justifications for the denial.

43.     The justifications included that the need for the variance was created "either intentionally or *inadvertently* by the actions of the applicant."  See Planning Director Communication to Zoning Board of Appeals attached hereto as Exhibit B.

44.     The purpose of a variance is to allow property owners to remedy an issue of zoning that is necessary for the particular use desired by the owner.  Such condition would, by definition, arise as a result of "intentional or inadvertent" action by the property owner.

45.     The Planning Director also asserted that "financial hardship is not a basis for a hardship" without any supporting authority and, among other things, that the "requested variance is more than the minimum necessary to be consistent with and in harmony with the Zoning regulations."  The City, however, has failed to identify the "minimum" that would be in harmony with the regulations.

46.     One of the City's alleged concerns is the potential devaluation of the adjacent residential property.  However, because the property existed in its present form and use when the nearby houses were built, the homes have never been valued without the Brunings' current operation.  It is an unreasonable assumption that allowance of a variance without change in the use or appearance of the Brunings property would somehow decrease the value of the nearby homes.  If the Brunings are forced to return the property to an agricultural use, that will likely have a much more detrimental effect on the adjacent property values.  Many neighbors of the Brunings have raised this issue in support of the Brunings' application for variance.

47.     The Brunings will suffer irreparable harm if they are criminally charged as a result of the City's refusal to allow a zoning variance permitting the continued use of the property.

48.     The Brunings will suffer irreparable harm if they are deprived of their use of the real property.

49.     The goal of the City appears to be to force the Brunings to abandon the property so that the City can obtain it for the use of a developer to build single-family homes.

50.     The City is attempting to use a denial of a variance that it effectively forced and induced the Brunings to apply for so that it can change the use of the property without the necessity of a formal taking, which would require compensation.

51.     As a direct and proximate result of the actions of the City, the Brunings have suffered injuries and damages.

## EQUAL PROTECTION OF THE LAW

52.     The Brunings incorporate all the allegations contained in the preceding paragraphs as if set forth in full herein.

53.     The Fourteenth Amendment to the Constitution of the United States provides in pertinent part:

> All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

54.     42 U.S.C. § 1982 provides:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

55.     42 U.S.C. § 1981 provides, in pertinent part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be

parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

56.     The Brunings were discriminated against and treated differently than similarly situated landowners.

57.     The Brunings constitute a "class of one" being subjected to treatment different from treatment given to other similarly situated land owners.

58.     The Brunings have been singled out of a group of landowners whose land is zoned agricultural but is used for light industrial or commercial purposes by persons other than the landowners.

59.     The City knows or should know that its refusal to grant the variance is a violation of well-established law and Constitutional principles.

60.     The Brunings are entitled to a Temporary Restraining Order precluding the City from charging the Brunings with civil or criminal violations of the law and a Preliminary Injunction precluding the City from bringing civil or criminal violations against the Brunings during the pendency of this action.

## EQUITABLE ESTOPPEL

61.     The Brunings incorporate all the allegations contained in the preceding paragraphs.

62.     There has been no essential change in function of the property since 1979.

63.     The Brunings attempted to obtain a building permit for each building erected on the above-described property since 2002.

64.     The Brunings informed representatives of the City's Planning and Zoning Department of the intended use of the buildings at the time each building was constructed.

65.     The Brunings were told on each occasion by the City's Planning and Zoning representatives that no permit was required for agricultural buildings.

66.     Due to the City's false representations, the Brunings lacked knowledge and the means of knowledge to know that a permit was needed.

67.     The Brunings relied on the representations made by the City's representatives and constructed the buildings without a building permit.

68.     During lengthy negotiations with the City over what could be done so the Brunings could continue to operate without losing their sole retirement income, it was represented to the Brunings that if the life safety issues were taken care of, the zoning variances would be granted.  Jay Davis on behalf of the City has made representations that he had reached agreements with the Brunings that would bring the buildings up to code for the anticipated uses and that the life-safety issues were resolved from that standpoint.

69.     In reliance on those representations, the Brunings paid more than $6,000 for a check of the septic system, state water quality testing, had fire walls constructed, and hired an architect to do drawings for the firewalls and purchased all the materials for firewalls.  The Brunings also hired S & W Fence to construct additional gates on the property in accordance with the requests of Jay Davis of the City Planning Department to facilitate access of fire trucks. These actions of the Brunings would have resolved all of the purported life safety issues raised by the City.

70.     However, as the Brunings complied with the City's requests and demands, its demands only increased in terms of size and scope.  The requirements imposed by the City were arbitrary, not based upon any discernible standards, rules, or laws, and clearly designed to make

the requirements so onerous, costly, and complicated that it would be physically and financially impossible for the Brunings to comply.

71.     The City further induced the Brunings into refraining from taking action and exercising their Constitutional rights by representing that it wanted to and would work with the Brunings on an amicable resolution if the Brunings were willing to delay the issue until after the Mayoral election.

72.     The Brunings relied upon the City's promises, representations, and inducements by foregoing suit and statements to the public and press about the City's unlawful actions until after the election.

73.     The City's promises, representations, and inducements were a sham as it had no intention of working with the Brunings, it just did not want the Brunings to cause harm to administration before the election.  They City did effectively nothing to work with or resolve the issues with the Brunings after the Mayoral election.

74.     The Brunings have been damaged by their reliance on the representations made by the City's representatives.

75.     Nebraska law allows government entities to be estopped from action upon a showing that the entities action or inaction caused the party alleging estoppel to have relied on the entity's representations to their detriment.

76.     The Brunings relied, reasonably and in good faith, to their detriment, upon the conduct and statements of the City.

77.     Under these circumstances, the City should be equitably estopped from demanding that the buildings for which they refused to issue permits must now acquire such permits and demanding the buildings meet the code standards that currently exist.

78.     During argument on the state appeal, the attorney for the City conceded such representations were made but were not relevant.

## UNLAWFUL TAKING

79.     The Brunings incorporate all the allegations contained in the preceding paragraphs as if set forth in full herein.

80.     In addition to the Fourteenth Amendment to the Constitution of the United States, Neb. Const. Art. I, § 21, provides, "The property of no person shall be taken or damaged for public use without just compensation therefor."

81.     The City possesses the power of eminent domain.

82.     The City's actions constitute an effective and inverse taking and damage to the Brunings' property and related property rights for which no compensation has been provided.

83.     The City has failed to institute condemnation.

84.     Under the circumstances, the City should be required to provide just compensation to the Brunings' for the property and/or property rights effectively taken, damaged, and/or diminished.

## BILL OF ATTAINDER

85.     The Brunings incorporate all the allegations contained in the preceding paragraphs as if set forth in full herein.

86.     The Constitution of the United States, Article I, Section 9, provides, in pertinent part: "No Bill of Attainder or ex post facto Law will be passed."

87.     The City's actions, position, and policies have been specifically designed for and specifically target the Brunings for disparate treatment and punishment.

88.     The City concedes that it is aware of multiple properties that are in a position similar to the Brunings where the City contends that those properties are operating under non-conforming uses.

89.     The City concedes that is has taken no enforcement activities against those properties and allows them to perform what it contends are similar non-conforming uses.

90.     Consequently, the City's actions, position, and policies in regards to the Brunings violate the Bill of Attainder Clause and should be declared invalid and ultra vires.

## EX POST FACTO

91.     The Brunings incorporate all the allegations contained in the preceding paragraphs as if set forth in full herein.

92.     The Constitution of the United States, Article I, Section 9, provides, in pertinent part: "No Bill of Attainder or ex post facto Law will be passed."

93.     The City's actions, position, and policies constitute retroactive changes to the legal consequences and/or status of the actions that took place and the relationships that existed prior.

94.     The City's actions, position, and policies criminalize and penalize actions that were legal and authorized by the City when committed.

95.     Consequently, the City's actions, position, and policies in regards to the Brunings violate the Ex Post Facto Clause and should be declared invalid and ultra vires.

## DEMAND FOR JURY TRIAL

96.     Plaintiffs hereby demand trial by jury on all claims so triable.

97.     Pursuant to United States District Court of Nebraska Local Rule 40.1(b), Plaintiffs request the trial be held in Omaha, Nebraska.

WHEREFORE, Plaintiffs request relief as follows:

A.      A temporary restraining order preventing the City of Omaha from bringing criminal or civil action against the Brunings;

B.      A Preliminary Injunction preventing the City of Omaha from bringing criminal or civil action against the Brunings during the pendency of this action;

C.      A Preliminary Injunction preventing the City of Omaha from taking any further action against the Brunings for the current use of the property during the pendency of this action;

D.      A declaration that the Brunings are entitled to a zoning variance to continue the present use of the property;

E.      A declaration that the Brunings do not have to take further action to alter the buildings existing on the property;

F.      All general, special, compensatory, statutory, and punitive damages in amounts to be proven at trial;

G.      Attorneys fees, appraisal fees, and costs as may be allowed by law; and

H.      Such other and further relief as is just and necessary.

                                        ROBERT BRUNING AND SHARON
                                        BRUNING, Plaintiffs,

                                By: */s/ Diana J. Vogt*_____
                                        Diana J. Vogt, #19387
                                        Jason M. Bruno, #23062
                                        SHERRETS BRUNO & VOGT LLC
                                        260 Regency Parkway Drive, Suite 200
                                        Omaha, NE 68114
                                        Tele:  (402) 390-1112
                                        Fax:   (402) 390-1163
                                        law@sherrets.com

                                        ATTORNEYS FOR PLAINTIFFS

**EXHIBIT A**

List of Other non-conforming uses, zoning not enforced

1.      5605 N. 168th Street, formerly Orien Motor Sports, now Landscaping business

2.      13560 Lake Street: Pat's Irish Green Lawn & Landscape (R3)

3.      9404 State Street:  Owner rents buildings to Landscapers

4.      6201 North 132nd Street.  Selling outdoor furniture, firewood, etc. (DR)

5.      6153 N. 132nd Street: Commercial landscaping

6.      7535 N. 120th Street: Nebraska's Best Lawn & Landscape (Ag)

7.      4710 N. 132nd Street: Monroe Excavating & Grading Zoning (R4)

8.      15401 Ida Street: Fortina Tile and Granite

9.      15905 Fort Street: Stone Creek Lawns

10.     14919 Fort Street: D & A Remodeling

**INTER-OFFICE COMMUNICATION**
**CITY OF OMAHA**
**PLANNING DEPARTMENT**

**TO:**        Chairman and Members of the Zoning Board of Appeals

**FROM:**    James R. Thele, Planning Director

**DATE:**    June 1, 2017

**SUBJECT:**  Update on Layover Case #16-118 – 16201 Fort Street

This request was laid over at the May 11, 2017 meeting to allow the applicant time for further discussions with the Public Works Department and the neighbors.

The applicant met with Public Works staff to discuss various issues related to the request.

The applicant has submitted a traffic study and additional information regarding the uses on the site. Based on the additional information regarding the uses the Department has determined that there is no change to the use waivers as listed on the agenda.

The information does not adequately address the zoning waivers and other issues that have been mentioned in previous reports including, but not limited to subdivision, traffic/access and Master Plan policies.

The Planning Department finds that there is no demonstrated hardship or practical difficulty as defined by law for the following reason(s):
- The property can be developed in compliance with the ordinance. This request is a design preference that exceeds allowed zoning standards.
- The need for the requested variance was created either intentionally or inadvertently by the actions of the applicant.
- The requested variance is based on the financial situation of this applicant. The financial condition of the applicant is not a basis for a hardship.
- The requested variance does not encourage stability of the neighborhood or assure the protection of other property in the area.
- The need for the variance does not result from an unnecessary and unjust invasion of the fundamental right of property; i.e., the applicant does not lose the entire right to use the property without the variance.
- The requested variance does not protect the health and safety of the community.
- The variance would injure or result in an injustice to others. The variance may damage the property values of an adjacent parcel. This must be weighed against the hardship to the applicant.
- This requested variance would grant special or peculiar favor to this applicant, which is not enjoyed by other property owners in the same district.
- The requested variance does not comply with the intent, spirit, purposes, and general plan of the Zoning regulations, which is the expressed development policy of the City of Omaha.
- The requested variance is more than the minimum necessary to be consistent with and in harmony with the Zoning regulations.

The Planning Department recommends denial.

EXHIBIT B